**Scot J. COHEN, et al., Plaintiff,**

v.

**Steve STEVANOVICH, et al., Defendants.**

**No. 09 Civ. 4003.**

United States District Court, S.D. New York.

July 1, 2010.

Weitzman Law Offices, L.L.C., by: Raphael Weitzman, Esq., New York, NY, for Plaintiffs.

Sullivan and Cromwell, LLP, by: Richard C. Pepperman, Esq., Richard H. Klapper, Esq., Tracy R. High, Esq., New York, NY, Davis Polk & Wardwell, LLP, by: Robert F. Wise, Jr., Esq., William J. Fenrich, Esq., New York, NY, Proskauer Rose LLP, by: Brian L. Friedman, Esq., Stephen L. Ratner, Esq., New York, NY, O'Melveny & Myers LLP, by: Andrew J. Frackman, Esq., Benjamin D. Petrosky, Esq., Brendan J. Dowd, Esq., New York, NY, Wilmer, Cutler, Hale & Dorr, LLP, by: Eraser L. Hunter, Jr., Esq., New York, NY, Cadwalader, Wickersham & Taft LLP, by: Gregory Arthur Markel, Esq., Martin L. Seidel, Esq., Peter Joseph Isajiw, Esq., New York, NY, Kirkland and Ellis LLP, by: Andrew Brian Clubok, Esq., Jeffrey Landis, Esq., Beth Ann Williams, Esq., Daniel J. Gomez, Esq., Maria Ginzburg, Esq., Washington, DC, for Defendants.

## OPINION

SWEET, District Judge.

Scot J. Cohen, The Merav Abbe Irrevocable Trust, Abbe Berman Foundation, Coleman Abbe, Cleveland Overseas Ltd., Philip W. Mirabelli, Vertical Ventures, LLC, Martin D. Goldman, Ari S. Goldman, Dan Burko, Abco Quality Engines & Transmissions, Inc, and Ellis International, LP (collectively the "Plaintiffs") have sued Morgan Stanley & Co. Incorporated, The Goldman Sachs Group, Inc., J.P. Morgan Clearing Corp., JP Morgan Chase & Co., Banc of America Securities LLC, Credit Suisse USA, Inc., Deutsche Bank Securities Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, and UBS Securities, LLC (collectively, the "Financial Institution Defendants"), among others, violations of (i) the Securities and Exchange Act, 1934 (the "Exchange

Act")—Sections 9,10, 18, and 20, (ii) 17 C.F.R. § 240.10b–5; (iii) conspiracy, and (iv) common law fraud. The Financial Institution Defendants have moved, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the Amended Complaint (the "AC") for failure to state a claim upon which relief can be granted.[1] Pursuant to the authorities and conclusions set forth below, the motion is granted and the AC is dismissed as to the Financial Institution Defendants. Plaintiffs are granted leave to replead.

## I. *PRIOR PROCEEDINGS*

Plaintiffs' complaint was filed April 22, 2010 and was amended on December 31, 2009, properly joining UBS Securities, LLC, as a party in place of UBS Financial Services, Inc.

The instant motion was marked fully submitted on January 25, 2010.

## II. *ALLEGATIONS OF THE AMENDED COMPLAINT*

The AC generally asserts that "Defendants engaged in a massive, illegal stock manipulation scheme." AC ¶ 2. First, Plaintiffs contend that "Defendants … have executed … short sales of SulphCo stock without first borrowing the stock or ensuring that the stock can be borrowed to settle the short sale"—so-called "naked short sales." *Id.* Plaintiffs further contend that "Defendants have intentionally failed to borrow SulphCo stock to settle the short positions." *Id.* Second, Plaintiffs claim that "Defendants orchestrated a wide-scale predatory campaign of knowingly distributing false, and covertly bi-

ased, written reports about SulphCo." *Id.* ¶ 3. They state that Geoffrey Tirman ("Tirman") (who is not alleged to be affiliated with any Financial Institution Defendant) "approached William Alpert, a reporter at Barron's Magazine, and bribed him to write an article containing false and covertly biased written reports about SulphCo." *Id.* Plaintiffs assert that the Financial Institution Defendants somehow "worked together with" Tirman and Steve Stevanovich ("Stevanovich") (another unaffiliated individual) "without disclosing the unscrupulous collaboration." *Id.*

### 1. The Alleged Manipulation of SulphCo Stock

Plaintiffs contend that Defendants engaged "in a series of transactions" that manipulated the price of SulphCo's stock beginning in 2004. AC ¶ 2. According to the AC, "from October 26, 2005[sic] and September 29, 2006, large quantities of SulphCo shares were the subject of naked short selling." *Id.* ¶ 46. Plaintiffs argue that the Financial Institution Defendants "were motivated to intentionally fail to deliver stocks allowing them to earn more money through the charging of fees, commissions and/or interest through phantom securities transactions." *Id.* ¶ 48. And Plaintiffs assert, "[u]pon information and belief," that "Defendants also profited from naked short selling of SulphCo securities for their own benefit." *Id.*

The AC does not identify any supposedly manipulative naked short sales by any Financial Institution Defendant-or anyone else. Instead, Plaintiffs allege that Defen-

---

1. The AC improperly names The Goldman Sachs Group, Inc., JP Morgan Chase & Co. and Credit Suisse USA, Inc. as defendants. Those entities are parent corporations not engaged in the activities alleged in the Complaint. Because Plaintiffs allege no independent basis for liability against them, those

companies do not belong as named parties in this action and are dismissed. *See, e.g., United States v. Bestfoods,* 524 U.S. 51, 61, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) (stating that it is a "general principle of corporate law … that a parent corporation … is not liable for the acts of its subsidiaries.").

dants' unidentified naked short sales resulted in similarly unidentified "fails to deliver," which supposedly created "phantom shares" of SulphCo stock and caused the number of shares of SulphCo that are beneficially owned to exceed the number issued by the company. *Id.* ¶¶ 46, 47, 49.[2]

### 2. The Alleged Scheme to Bribe the Barron's Reporter

The AC asserts that "Defendants orchestrated a wide-scale predatory campaign of knowingly distributing false, and covertly biased, written reports about SulphCo." AC ¶ 3. Plaintiffs state that "Defendants posted negative information about SulphCo" in "Barron's Magazine and Barron's Online." *Id.* ¶ 42. The AC does not quote or describe this "negative information," explain how it was false or misleading, or identify the Defendant that supposedly posted it. Plaintiffs simply assert that these reports contained "plenty of innuendos." *Id.*

The only specifics alleged in the AC relate to a January 23, 2006 article that appeared in *Barron's*. *See* William Alpert, *A Crank Case*, Barron's Magazine, Jan. 23, 2006, at 42. Plaintiffs contend that "Defendant TIRMAN approached William Alpert, a reporter at Barron's Magazine and bribed him to write an article containing false and covertly biased written reports about SulphCo." AC ¶ 3. Plaintiffs assert that "[t]he article failed to disclose that the Defendants controlled its content, and that

the article was not independent and objective analysis of their target." *Id.* ¶ 45. According to the AC, "[t]he article does not discuss the technology of SulphCo, but engages in plenty of innuendos about [SulphCo's founder] and his educational background." *Id.* ¶ 3. Plaintiffs allege that the price of SulphCo stock "drastically dropped" following the publication of the *Barron's* article. *Id.*

The AC pleads no facts regarding Tirman's purported bribe or the Financial Institution Defendants' supposed connection with it or the *Barron's* article. The AC is silent concerning the amount of the alleged bribe, when it was supposedly made, or who was present at the time. Nor does the AC allege that any Financial Institution Defendant ever spoke to Alpert regarding SulphCo, much less offered him an inducement to publish an unflattering article. Similarly, Plaintiffs allege no facts to support their conclusory assertion that the Financial Institution Defendants somehow "controlled the timing of the release and dissemination" of reports in *Barron's*. *Id.* ¶ 44.

### III. THE LEGAL STANDARD

"When considering a motion to dismiss, the complaint is liberally construed, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *In re Tommy Hilfiger Sec. Litig.*, No. 04–CV–

---

**2.** Plaintiffs allege that the creation of these so-called phantom shares "artificially depressed" the price of SulphCo securities by "remov[ing]" any supply constraint on stock sales," thereby flooding the market with a purportedly unlimited number of "phantom shares." *Id.* ¶¶ 39–41, 47, 49. The SEC, however, has repeatedly rejected the notion that "fails to deliver" create "phantom shares." *See* SEC, *Division of Market Regulation: Responses to Frequently Asked Questions Concerning Regulation SHO*, at Question 7.1

(Jan. 3, 2005) available at http://www.sec.gov/divisions/marketreg/mrfaqregsho1204.htm (Declaration of Richard C. Pepperman, II ("Pepperman Decl.") Ex. A); Brief for the SEC as Amicus Curiae, 14–16, *Nanopierce Techs., Inc. v. DTCC*, 123 Nev. 362, 168 P.3d 73 (2007) available at http://www.sec.gov/litigation/briefs/nanopiercesecbrief.pdf (Pepperman Decl. Ex. B); Brief for the SEC as Amicus Curiae, 16, *Whistler Invs., Inc. v. DTCC*, 539 F.3d 1159 (9th Cir.2008) (Pepperman Decl. Ex. C).

7678, 2007 WL 5581705, at *2, 2007 U.S. Dist. LEXIS 55088, at *5 (S.D.N.Y. July 20, 2007) (internal quotation marks and citations omitted). A complaint must allege "enough factual matter (taken as true)" to suggest that a violation occurred, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable ..." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (emphasis added; citation omitted). The pleading need only contain "[f]actual allegations ... [sufficient] to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1940–41, 173 L.Ed.2d 868 (2009).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft,* 129 S.Ct. at 1949. For elements of claims subject to Rule 8(a), *Twombly* requires more than pleading the "bare elements of [the] cause of action," but far less than the particularity of pleading required under Fed.R.Civ.P. 9(b). See *id.* at 1954.

■ Under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. 240.10b–5(b), a plaintiff must plead six elements in order to demonstrate securities fraud: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Heller v. Goldin Restructuring Fund, L.P.,* 590 F.Supp.2d 603, 613 (S.D.N.Y.2008) (citations omitted). The heightened pleading standard under the Private Securities Litigation Reform Act of 1995 ("PSLRA") and *Tellabs v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) applies only to the element of scienter; all other elements of a § 10(b) claim are governed by traditional pleading standards under Fed.R.Civ.P. 8(a) or 9(b). See *In re PXRE Group, Ltd. Sec. Litig.,* 600 F.Supp.2d 510, 528–29 (S.D.N.Y.2009). Rule 9(b) merely requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statement were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir.2004) (internal citations and quotation marks omitted). A plaintiff is not required to plead evidence. See *Skydell v. Ares–Serono S.A.,* 892 F.Supp. 498, 501 (S.D.N.Y.1995).

## IV. PLAINTIFFS FAIL TO ALLEGE A FEDERAL SECURITIES LAW VIOLATION

### A. Plaintiffs Have Not Adequately Pled the Elements of Their Securities Law Claims

### 1. Plaintiffs Have Not Adequately Alleged Market Manipulation under Sections 9(a) and 10(b)

■ Plaintiffs contend that Defendants as an undifferentiated group have "engaged in a massive, illegal stock market manipulation scheme." AC ¶ 2. Yet their AC does not allege actionable market manipulation under any provision of the federal securities laws. As the Supreme Court has stated, market manipulation is "virtually a term of art when used in connection with securities markets. It connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199, 96 S.Ct. 1375, 47

L.Ed.2d 668 (1976). "General allegations not tied to the defendants or resting upon speculation are insufficient." *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir.2007).

■ To state a claim for manipulation under Section 9(a)(1), plaintiffs must specifically identify particular wash sales or matched orders. 15 U.S.C. § 78i(a)(1)(A–C); *see SEC v. Malenfant*, 784 F.Supp. 141, 144 (S.D.N.Y.1992). Similarly, Section 9(a)(2) requires plaintiffs to identify transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security with the intent to deceive or defraud investors. 15 U.S.C. § 78i(a)(2); *see Fezzani v. Bear, Stearns & Co.*, 384 F.Supp.2d 618, 637 (S.D.N.Y.2004). Likewise, to state a manipulation claim under Section 10(b) and Rule 10b–5, plaintiffs must identify wash sales, matched orders, rigged prices, or some other manipulative act intended to mislead investors by artificially affecting market activity. *Santa Fe Indus. v. Green*, 430 U.S. 462, 476, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

■ Plaintiffs' broad and conclusory allegations of naked short selling do not state a claim for market manipulation. The AC contains no allegations of wash transactions, matched orders or other similar activity, and does not assert that the parties to the alleged short sales were anything other than bona fide buyers and sellers trading at the reported price of the transaction.[3] The fact that the seller was allegedly unable to deliver the security on the settlement date—three days after the transaction—does not transform that legitimate sale into unlawful market manipulation. Even when the seller is unable to deliver the stock on the settlement date, both parties obtain contractual settlement and still bear the market risk of the transaction. This is far different from a wash sale or similar transaction in which a manipulator acts as both the buyer and seller in order to give the false appearance of actual trades without assuming any actual risk. In *ATSI*, plaintiff similarly attempted to base an inference of manipulation "upon Depository Trust Company records showing that 8,256,493 shares [of ATSI] were traded in excess of settlements during [a] 10–day period." 493 F.3d at 104. In upholding the dismissal of the manipulation claim, the Second Circuit concluded that "[t]he inference [plaintiff] asks us to draw is too speculative even on a motion to dismiss." *Id.*

■ As a result, allegations of failures to deliver, without more, are insufficient to state a claim for market manipulation. Instead, "[t]o be actionable as a manipulative act, short selling must be willfully combined with something more to create a false impression of how market participants value a security." *Id.* at 101; *see also Nanopierce Techs., Inc. v. Southridge Capital Mgmt.*, No. 02–CV–0767, 2008 WL 1882702, at *2, 2008 U.S. Dist. LEXIS 34560, at *6 (S.D.N.Y. Apr. 21, 2008) ("Mere sales do not inject false informa-

---

3. Although Plaintiffs attach to the AC purported records of SulphCo trading activity and a list of dates on which SulphCo was deemed a "threshold" security, the AC does not explain how these items supposedly evidence that the Financial Institution Defendants engaged in manipulative "naked" short selling. These exhibits identify no short sales effected by any Financial Institution Defendant, much less purportedly illegal "naked" short sales. In-

deed, the SEC has stated that a stock's inclusion on a "threshold" list "does not necessarily mean that any improper activity occurred or is occurring" because there are many reasons why a security might appear and remain on a "threshold" list. SEC, *Division of Market Regulation: Key Points About Regulation SHO*, available at http://www.sec.gov/spotlight/keyregshoissues.htm (Pepperman Decl. Ex. D).

tion into the marketplace, nor can a party inject false information into the marketplace ... simply by selling stock on the open market."). Here, the short selling activity alleged in the AC does not demonstrate that the Financial Institution Defendants distorted the price of SulphCo stock and does not constitute "willful conduct designed to deceive or defraud investors" with regard to market activity in SulphCo stock. *Ernst & Ernst,* 425 U.S. 185, 199, 96 S.Ct. 1375 (1976).

Plaintiffs' general allegation that naked short selling resulted in the creation of "phantom shares" that artificially depressed the price of SulphCo stock (AC ¶¶ 40–41, 49) is also insufficient. In a release regarding Regulation SHO, the SEC expressly rejected the theory that naked short sales create "phantom" or "counterfeit" shares:

> Question 7.1: Do naked short sale transactions create "counterfeit shares?"
>
> Answer: Some believe that naked short sale transactions cause the number of shares trading to exceed the number of shares outstanding, which in turn allows broker-dealers to trade shares that don't exist. Others believe that the U.S. clearance and settlement system, and specifically the National Securities Clearing Corporation's ("NSCC") Continuous Net Settlement System ("CNS"), produces "phantom" or "counterfeit" securities by accounting for fails to deliver.
>
> *Naked short selling has no effect on an issuer's total shares outstanding. There is significant confusion relating to the fact that the aggregate number of positions reflected in customer accounts at broker-dealers may in fact be greater than the number of securities issued and outstanding.* This is due in part to the fact that securities intermediaries, such as broker-dealers and banks, credit customer accounts prior to delivery of the securities. For most securities trading in the U.S. market, delivery subsequently occurs as expected. However, fails to deliver can occur for a variety of legitimate reasons, and flexibility is necessary in order to ensure an orderly market and to facilitate liquidity. Regulation SHO is intended to address the limited situations where fails are a potential problem (for example, fails in securities on a threshold list).

Pepperman Decl. Ex. A (emphasis added). *See also* Pepperman Decl. Ex. C at 16 ("The party failing to deliver continues to have an obligation to deliver the shares. This shift of consequences does not (and cannot) increase the number of securities issued....").

"Short selling—even in high volumes—is not, by itself, manipulative. Aside from providing market liquidity, short selling enhances pricing efficiency by helping to move the prices of overvalued securities toward their intrinsic values." *ATSI,* 493 F.3d at 101 (internal citations omitted).[4] In *ATSI,* the Second Circuit upheld the dismissal of a market manipulation claim based on short sales, holding that the "allegations fail to state even roughly how many shares the defendants sold, when they sold them, and why those sales caused the precipitous drop in stock price." *Id.* at 103. The AC here similarly lacks

---

**4.** As the Seventh Circuit explained in another market manipulation case involving short sales, "we would think twice before concluding that [the securities] laws prohibit 'schemes' that accelerate rather than retard the convergence between the price of a stock and its underlying economic value and therefore promote rather than impair the ultimate goals of public regulation of the securities markets.... Far from launching a balloon, [defendant's] short sales punctured a balloon, bringing prices down to earth where they belonged." *Sullivan & Long, Inc. v. Scattered Corp.,* 47 F.3d 857, 861–62 (7th Cir.1995).

such details. Aside from bald conclusions, there are no allegations in the AC that the entirely undefined short selling alleged here was manipulative in any respect, even assuming that the effect of such trading was to depress the price of SulphCo stock.

Plaintiffs also have failed to satisfy other threshold requirements of Sections 9(a)(1) and 9(a)(2). Plaintiffs acknowledge that they must allege "a wash sale or matched orders in a security" to state a claim under Section 9(a)(1). (Opp'n ¶ 23.) They assert, however, that "the dates on which Naked Short Selling took place" are "clear proof of existence of wash sales and matched orders." (*Id.*) This assertion is incorrect. Neither the Complaint nor Plaintiffs' Opposition identifies any dates on which any Financial Institution Defendant was involved in "naked" short sales of SulphCo stock. Further, Plaintiffs' unsupported claim that "naked" short sales alone are "clear proof" of wash sales and matched orders is erroneous. A wash sale is a "sale of securities made at about the same time as a purchase of the same securities . . . resulting in no change of beneficial ownership." *Black's Law Dictionary* 1456 (9th ed.2009). A matched order is an "order to buy and sell at the best price immediately available on the market." *Id.* at 1208. Wash sales and matched orders are not the same things as "naked" short sales.

Plaintiffs also concede that they must allege "a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security" to state a claim under Section 9(a)(2). (Opp'n ¶ 24.) Plaintiffs contend that they have satisfied

this element of Section 9(a)(2) "through Exhibits A & B of the subject Complaint." (*Id.* ¶ 24.) Those Exhibits, however, purport to show nothing more than the price of SulphCo stock from 2004 through 2007 and the Reg. SHO Threshold List for selected dates in 2005 and 2006. They do not identify any transactions in SulphCo stock, much less tie any of the Financial Institution Defendants to those transactions, which is fatal to Plaintiffs' claim under Section 9(a)(2).

Finally, Plaintiffs' Opposition brief points to no wash sales, matched orders, rigged prices or other alleged manipulative act intended to mislead investors. Instead, Plaintiffs again rely entirely on Exhibits A and B to the Complaint, which purport merely to show the price of SulphCo stock over time and the days on which SulphCo appeared on the Threshold List. (*See id.* ¶¶ 13, 14.) Plaintiffs argue that "taking a glance" at these Exhibits "clearly shows" market manipulation by the Financial Institution Defendants. (*Id.* ¶ 27.)[5] This is simply wrong. A stock's presence on the Threshold List "does not necessarily mean that any improper activity occurred or is occurring" because there are many reasons why a security might appear and remain on that list. SEC, *Division of Market Regulation: Key Points About Regulation SHO* (Apr. 11, 2005) (Pepperman Decl. Ex. D).

## 2. Plaintiffs Have Not Adequately Alleged Any Actionable Misrepresentations by the Financial Institution Defendants

To the extent that Plaintiffs are asserting a misrepresentation claim against the

---

5. Without providing the Court with a copy of any decision, Plaintiffs attempt to rely on a case pending in California state court "in which Overstock.com is Plaintiff." (Opp'n ¶ 2.) They argue that this case "shows that Financial Institution Defendants are habitual offenders and they should be punished." (*Id.*) The "Overstock.com case" involved different claims under California state law and different allegations concerning the stock of a different company, and thus has no relevance to the instant motion. Reference to an unrelated lawsuit in a different jurisdiction does nothing to support Plaintiffs' claims in this action.

Financial Institution Defendants under Section 10(b) in addition to their manipulation clam, Plaintiffs fail to plead any facts connecting any supposed misrepresentation to any of the Financial Institution Defendants.

### i. Plaintiffs Have Not Pled Any Misrepresentations in an SEC Filing as Required by Section 18

■ Under Section 18 of the Exchange Act, a plaintiff must plead that "a document filed with the [SEC] contains a material misstatement or omission" and that the plaintiff relied on that misstatement or omission. *See Ross v. A.H. Robins Co.,* 607 F.2d 545, 556 (2d Cir.1979). Plaintiffs have failed to identify any SEC filings in their AC, much less allege that a document filed with the SEC contained a material misstatement or omission. Nor have they alleged that they relied on any SEC filing by any entity. They have therefore failed to state a claim under Section 18.

### ii. Plaintiffs Have Not Pled Any Misstatements or Omissions Attributable to Any Financial Institution Defendant as Required by Section 10(b)

■ Under Section 10(b), a plaintiff must plead that the defendant made a false statement or omitted a material fact. *See Stoneridge Inv. Partners LLC v. Scientific–Atlanta,* 552 U.S. 148, 156, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008); *In re Tower Auto. Sec. Litig.,* 483 F.Supp.2d 327, 333 (S.D.N.Y.2007). The defendant must actually make a false and misleading statement, and the statement must be attributable to the defendant at the time of

its public dissemination. *See Wright v. Ernst & Young LLP,* 152 F.3d 169, 175–76 (2d Cir.1998). In *Winkler v. Wigley,* 242 F.3d 369 (2d Cir.2000) (unpublished opinion), for example, the Second Circuit held that an outside public relations firm and an outside director and shareholder could not be liable for misleading statements contained in a company press release because the misleading statements were made by, and attributed to, the company's president. *Id.* at \*3. *See also Steinberg v. Sherman,* No. 07–CV–1001, 2008 WL 2156726, at \*4 (S.D.N.Y. May 8, 2008) (dismissing claims against individual defendants because complaint failed to attribute misstatements specifically to them); *In re Parmalat Sec. Litig.,* 383 F.Supp.2d 616, 623–24 (S.D.N.Y.2005) (dismissing claims for failure to plead that particular defendants participated in the making of the false statement or that the false statement was attributed to them).

■ Here, Plaintiffs have failed to identify any misleading statements or omissions made by or attributed to any Financial Institution Defendant. Instead, Plaintiffs allege that Tirman "bribed" a *Barron's* reporter, William Alpert, to write an article that supposedly contained false statements, some of which are attributed to an unidentified hedge fund. AC ! 3.[6] Plaintiffs do not allege that any of the Financial Institution Defendants were even aware of the statements contained in the article or knew that they were false. Nor do Plaintiffs identify any statements in the article that were attributed in any way to any Financial Institution Defendant. Plaintiffs instead simply assert, without any supporting factual al-

---

**6.** Any federal securities claim predicated on the January 26, 2006 *Barron's* article by William Alpert also is barred by the applicable statute of limitations because the article was published more than two years before this action was commenced. *See* 15 U.S.C. § 78r(c); 28 U.S.C. § 1658(b); *see also Staehr v. Hartford Fin. Servs. Group, Inc.,* 547 F.3d 406, 411 (2d Cir.2008) (Section 10(b)); *In re Alstom SA Sec. Litig.,* 406 F.Supp.2d 402, 419–20 (S.D.N.Y.2005) (Section 18).

legations, that the Financial Institution Defendants "worked together with" Tirman and Stevanovich "without disclosing the unscrupulous collaboration." *Id.* The AC does not allege any facts describing how the parties supposedly worked together or what the "unscrupulous collaboration" was. Accordingly, Plaintiffs have failed to plead facts to support their misrepresentation claims.

### 3. Plaintiffs Have Not Adequately Alleged Scienter for Purposes of Their Section 9(a) and 10(b) Claims

■■■■■ To plead a claim under Section 9(a) and Section 10(b), plaintiffs must "state with particularity facts giving rise to a strong inference that each defendant acted with scienter." *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.,* 551 F.Supp.2d 210, 228 (S.D.N.Y.2008) (internal quotation marks omitted); *see also Crane Co. v. Westinghouse Air Brake Co.,* 419 F.2d 787, 794 (2d Cir.1969) ("Sections 9(a)(2) and 9(e) contain requirements of both manipulative motive and willfulness"). Scienter is a " 'mental state embracing intent to deceive, manipulate or defraud.' " *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 319, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (quoting *Ernst & Ernst,* 425 U.S. at 193 n. 12, 96 S.Ct. 1375). In deciding whether the allegations of the AC give rise to a "strong inference" of scienter, the Court must consider whether any allegations of scienter are "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs,* 551 U.S. at 314, 127 S.Ct. 2499.

■■■■■ "Conclusory statements of associations" or generalized allegations of scienter against groups of defendants will not state a claim for securities fraud. *Edi-*

*son Fund,* 551 F.Supp.2d at 228; *see also In re NovaGold Res. Inc. Sec. Litig.,* 629 F.Supp.2d 272, 304 (S.D.N.Y.2009). Plaintiffs must plead specific facts as to each defendant that (1) give rise to a strong inference that the defendant had both motive and opportunity to commit fraud or (2) provide strong circumstantial evidence of "conscious misbehavior or recklessness." *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 168–69 (2d Cir.2000) (internal quotation marks omitted); *In re Tower Auto. Sec. Litig.,* 483 F.Supp.2d at 336.[7] Plaintiffs fail to plead facts giving rise to either inference.

Plaintiffs' Opposition demonstrates that they rely almost entirely on Exhibits A and B to their Complaint to allege scienter. (*See* Opp'n ¶¶ 27, 38, 43.) Nothing about those Exhibits, however, remotely connects the Financial Institution Defendants to any misconduct, much less gives rise to the requisite "strong inference" that each of them acted with scienter. The Financial Institution Defendants are nowhere mentioned in the Exhibits. Those entirely benign charts do not satisfy the PSLRA's requirements for pleading scienter.

Plaintiffs also argue that the Court can infer that certain unidentified "transactions were carried out with scienter because Defendants were having profits out of theses [sic] activity." (Opp'n ¶ 38; *see also id.* ¶ 41 ("Defendants engaged themselves in a series of transactions and illegal Naked Short Selling of SulphCo stock for over a period of year [sic] and made profits. . . .").) Leaving aside Plaintiffs' failure to identify any of the purportedly illegal transactions in which the Financial Institution Defendants supposedly engaged, a

---

7. Recklessness satisfies the scienter requirement only where it is so severe that it "approximat[es] actual intent, and not merely a

heightened form of negligence." *Novak v. Kasaks,* 216 F.3d 300, 312 (2d Cir.2000).

generalized motive to earn "profits" is insufficient to allege scienter. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196–97 (2d Cir.2008); *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir.1996); *In re Citigroup Auction Rate Sec. Litig.*, 700 F.Supp.2d 294, 305 (S.D.N.Y.2009).

With respect to the *Barron's* article, Plaintiffs assert, without any factual support, that "all Defendants knew" that the statements in *Barron's* were "false and immediately after publication of article they entered into series of transactions in high volumes and in the end failing to deliver on settlement day." (Opp'n ¶ 45.) The Opposition does not point to a single factual allegation suggesting that any Financial Institution Defendant was aware of the *Barron's* article, much less knew that it supposedly contained false statements. And even if someone at one of the Financial Institution Defendants did know that the *Barron's* article contained a false statement, that fact alone would not give rise to a "strong inference" that any Financial Institution Defendant acted with "intent to deceive, manipulate or defraud." *Tellabs*, 551 U.S. at 314, 127 S.Ct. 2499. Generalized allegations of scienter directed at a group of defendants and based entirely on conclusory statements are insufficient to state a claim for securities fraud. *See In re NovaGold Res. Inc. Sec. Litig.*, 629 F.Supp.2d 272, 304 (S.D.N.Y.2009); *Edison Fund*, 551 F.Supp.2d at 228.

**i. Plaintiffs Have Not Adequately Alleged That the Financial Institution Defendants Had a Motive to Commit Fraud**

▮ To plead motive and opportunity to commit fraud, Plaintiffs must allege, as to each defendant, that the defendant would realize "concrete benefits" from the fraud. *Suez Equity Investors L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 100

(2d Cir.2001) (internal quotation marks omitted). Generalized motives that could be attributed to any "for-profit endeavor" will not suffice. *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir.1996); *accord Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196–97 (2d Cir.2008); *Coates v. Heartland Wireless Commc'ns, Inc.*, 100 F.Supp.2d 417, 431–32 (N.D.Tex.2000) ("A generalized motive that 'could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter.' ").

Here, Plaintiffs attempt to plead scienter by alleging that the Financial Institution Defendants "were motivated ... to earn more money through the charging of fees, commissions and/or interest," and that "Defendants" engaged in short selling for profit in their own accounts. AC ¶ 48. These are exactly the kinds of generalized profit-seeking motives that courts have repeatedly rejected. *See Dynex*, 531 F.3d at 196–97. In *Edison Fund*, for example, plaintiffs alleged that some of the defendants, a hedge fund manager and member, failed to disclose certain information about the performance of the fund because the fund "paid the ... Defendants extraordinarily high management fees." 551 F.Supp.2d at 227. The Court dismissed the claims against those defendants, explaining that "the desire to earn management fees is a motive generally possessed by hedge fund managers, and as such, does not suffice allege a 'concrete and personal benefit' resulting from fraud." *Id.* See also *In re Citigroup Auction Rate Sec. Litig.*, 700 F.Supp.2d 294, 305–06 (S.D.N.Y.2009) ("Courts have repeatedly rejected conclusory allegations regarding the motivation to earn unspecified fees as a basis for inferring scienter"); *In re Salomon Analyst Winstar Litig.*, No. 02–CV–6171, 2006 WL 510526, at *10 (S.D.N.Y.

Feb. 28, 2006) (because "all firms in the securities industry want to increase profits and all individuals are assumed to desire to increase their compensation," allegations of motive to increase revenues and worth are too generalized to allege scienter); *Vogel v. Sands Bros. & Co.*, 126 F.Supp.2d 730, 739 (S.D.N.Y.2001) (plaintiff's "alleged desire to realize greater transaction fees" does not establish improper motive); *In re Cree, Inc. Sec. Litig.*, 333 F.Supp.2d 461, 476–77 (M.D.N.C.2004) ("Allegations of heavy trading or large profits, without further information, do not satisfy the scienter requirement").

Moreover, Plaintiffs have completely failed to plead any particularized facts as to any specific defendant, instead lumping "Defendants" or "Defendant Broker/Dealers" together. These general allegations do not plead scienter against any of the Financial Institution Defendants. *See In re NovaGold*, 629 F.Supp.2d at 303–04.

#### ii. Plaintiffs Have Not Adequately Alleged Conscious Wrongdoing or Recklessness

Plaintiffs also have failed to allege facts supporting a strong inference of conscious wrongdoing or recklessness, *i.e.*, "deliberate illegal behavior" or conduct that was "highly unreasonable" and "an extreme departure from the standards of ordinary care." *Novak*, 216 F.3d at 308 (internal quotation marks omitted); *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir.2001).

As to the short selling allegations, Plaintiffs have alleged only that Stevanovich and Tirman engaged in naked short selling of SulphCo stock and that "Defendant Broker/Dealers" as a group "intentionally fail[ed] to deliver stocks." AC ¶ 48. As previously discussed, the SEC has not imposed an outright prohibition on naked short selling, but rather has regulated the practice of selling short through Regulation SHO. Plaintiffs' allegations are insufficient to demonstrate either deliberate illegal conduct or highly unreasonable conduct representing an extreme departure from the standards of ordinary care by any of the Financial Institution Defendants. Moreover, Plaintiffs' assertions are not supported by any particularized factual allegations that might establish intentional wrongdoing. *See In re JP Morgan Chase Sec. Litig.*, 363 F.Supp.2d 595, 624 (S.D.N.Y.2005) (conclusory allegation that defendants received "kickback[s]" insufficient to establish deliberately illegal behavior).

As to the allegedly false statements made by *Barron's*, Plaintiffs have not alleged that any of the Financial Institution Defendants made these statements, knew that they were false or even knew that the statements were being made. Nor does the AC allege with any specificity what any Financial Institution Defendant's supposed role was in the publication of the challenged article.

Accordingly, Plaintiffs' claims under Sections 9(a) and 10(b) are fail to plead scienter.

#### 4. Plaintiffs Have Not Adequately Alleged Injury in Fact and Loss Causation

Plaintiffs have not pled facts supporting any legally cognizable loss. Nor have they adequately alleged any "causal connection between the [alleged manipulation or] material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). *See also Fezzani*, 384 F.Supp.2d at 637 (under Section 9(a), manipulative act must have "affected plaintiff's purchase or selling price") (internal quotation marks omitted). As the Second Circuit has held, a plaintiff must "allege [ ] facts that would allow a factfinder to ascribe some rough

proportion of the whole loss to" the defendant's misconduct. *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir.2007); *see also Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489, 1497 (2d Cir.1992) (holding that complaint failed to allege loss causation where it alleged "in a conclusory fashion ... that 'there [was] a direct causal link between defendants' fraud and Citibank's losses,'" and "[did] not detail how the alleged fraud directly and proximately resulted" in plaintiff's damage) (citations omitted). Such allegations are entirely missing here.

The AC's allegations that "Defendants' wrongful actions have resulted in substantial harm to Plaintiffs," all of whom are "current or former" shareholders of SulphCo, are entirely conclusory and do not plead injury in fact, let alone loss causation, with the requisite specificity. AC ¶¶ 6, 52–53. Significantly, the AC does not allege that any particular Plaintiff actually sold any SulphCo shares. To the extent any Plaintiff held his, her, or its shares throughout the relevant time period, their claim that Financial Institution Defendants somehow depressed the market price of SulphCo stock is too speculative to measure and does not constitute a legally cognizable loss. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 754–55, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *see also Chanoff v. United States Surgical Corp.*, 857 F.Supp. 1011, 1023 (D.Conn.1994) (holding that so-called "holder" plaintiffs cannot maintain claim under federal securities laws).

Even assuming that some Plaintiffs sold some or all of their shares (a critical allegation that the AC never makes with respect to any particular Plaintiff), the AC does not allege that those shares were sold at a loss, let alone that any such loss was caused by any Financial Institution Defendant's supposed misconduct. Plaintiffs are required to "allege facts indicating the economic loss they claim to have suffered," including "allegations as to the price each Plaintiff paid for the ... stock or the date on which each Plaintiff purchased the stock." *Joffee v. Lehman Bros., Inc.*, 410 F.Supp.2d 187, 192 (S.D.N.Y.2006). Although all of the information concerning Plaintiffs' stock transactions is plainly available to Plaintiffs, the AC fails to include this necessary information. Plaintiffs do not allege the amount of stock they purportedly sold, the date(s) on which the stock was sold, or the price initially paid and then received for any stock. Instead, Plaintiffs rest on conclusory allegations that they as a group either were precluded from selling their shares or were otherwise constrained to sell their shares at a loss. AC if 6, 52–53. As such, Plaintiffs have failed to plead any legally cognizable loss.[8]

Given that Plaintiffs have not pled any actionable loss, they have consequently also failed to allege facts establishing loss causation. *See In re Citigroup Auction Rate Sec. Litig.*, 700 F.Supp.2d at 307–08 (holding that because "Plaintiff has failed to allege that he suffered any specific economic harm as a result of Defendants' conduct ... he has not alleged loss causation sufficiently"); *In re Forest Labs. Sec. Litig.*, No. 05–CV–2827, 2006 WL 5616712, at *13 (S.D.N.Y. July 21, 2006) (holding that plaintiffs failed to establish causal link between fraud and fall in stock price

---

**8.** Because Plaintiffs allege that SulphCo stock has been artificially depressed since 2004 (AC ¶ 2), Plaintiffs who bought after that point may have benefited by purchasing their shares at a "bargain" price. *See Gurary v. Winehouse*, 190 F.3d 37, 46 (2d Cir.1999) (explaining that if defendant's actions depressed the share price, then plaintiff benefited from price decline by purchasing shares at a lower price than plaintiff would have otherwise paid).

where they did not "point [ ] to any specific stock price reaction due to [the misconduct]"). Plaintiffs' unsupported assertions that the Financial Institution Defendants somehow artificially depressed the price of SulphCo securities and thereby forced Plaintiffs to sell their stock at a loss or otherwise hold on to their shares at a diminished price are insufficient to "allow a factfinder to ascribe some rough proportion of the whole loss to" the Financial Institution Defendants' supposed misconduct. *Lattanzio*, 476 F.3d at 158.

Moreover, *Twombly* prohibits complaints that rely on "mere speculation," requiring plaintiffs to allege facts supporting a plausible—and not merely a possible—claim to relief. Yet the AC here fails to allege any facts that support Plaintiffs' contention that the Financial Institution Defendants' purported misconduct caused any so-called losses by Plaintiffs. In fact, Plaintiffs fail to allege even the most basic details of the Financial Institution Defendants' purported illegal short selling of SulphCo stock or identify any materially false or misleading statement in the *Barron's* article attributable to any Financial Institution Defendant. Such allegations are precisely the type of groundless claims that *Twombly* prohibits. Accordingly, Plaintiffs' securities law claims against the Financial Institution Defendants do not satisfy the loss causation requirement.[9]

Plaintiffs do not dispute that their "Complaint does not identify which Plaintiffs sold [shares of SulphCo stock], how many shares were sold, when those shares were sold, the price they received, or whether those sales were at a loss." (Opp'n ¶ 7.) They instead argue that such allegations are "not appropriate at the initial stage of the case" and that they are "a matter of Discovery." (*Id.; see also id.* ¶ 50.) This is incorrect. To survive a motion to dismiss, Plaintiffs must "allege facts indicating the economic loss they claim to have suffered." *Joffee v. Lehman Bros., Inc.*, 410 F.Supp.2d 187, 192 (S.D.N.Y.2006).[10] They have not even attempted to do so here, notwithstanding that all of the information concerning Plaintiffs' transactions in SulphCo stock is plainly available to them and thus need not await discovery. Nor can Plaintiffs defeat this motion simply by proclaiming that they have "claimed damages, both general and special, in the amount of One Billion

**9.** Although the Second Circuit has yet to decide whether loss causation must be pled with the specificity required by Rule 9(b), courts in this district, as well as the Fourth Circuit, have adopted the heightened pleading requirement. *See In re Mutual Funds Inv. Litig.*, 566 F.3d 111, 120 (4th Cir.2009) (holding that Rule 9(b) and the traditional pleading requirements for fraud claims apply to loss causation); *Harrison v. Rubenstein*, No. 02–CV–9356, 2007 WL 582955, at *14 (S.D.N.Y. Feb. 26, 2007) ("As with other aspects of securities fraud pleading, plaintiffs must allege specific facts to establish loss causation . . ."). Requiring that loss causation be pled under Rule 9(b) is consistent with the language of the rule itself, which requires that all circumstances of fraud, except for intent, be pled with particularity. In enacting the PSLRA, Congress specifically considered the pleading requirements for fraud, and amend-

ed how scienter must be pled, but did not do so for loss causation. While codifying loss causation as a statutorily required element of securities fraud, Congress discussed it as a "strong pleading requirement." S.Rep. No. 104–98, at 15 (1995) (placing discussion of loss causation under the heading *"A strong pleading requirement,"* which begins with a description of Rule 9(b)).

**10.** Plaintiffs' Opposition concedes that some undefined number of Plaintiffs still hold their shares of SulphCo stock. (Opp'n ¶ 54.) Those Plaintiffs who "decided to hold the stock" have not suffered any injury that is cognizable under the federal securities laws. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 754–55, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

Dollars," (Opp'n ¶ 46.) Plaintiffs have also failed to allege any facts supporting their allegation that twelve individual SulphCo shareholders have suffered damages "in the amount of One Billion Dollars" based on their investment in a company with a market capitalization far less than that amount. Because Plaintiffs have not adequately alleged that they suffered any economic injury, they also have failed to allege loss causation, a requisite element of their federal claims. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).[11]

### 5. Plaintiffs' Failure to Allege Reliance Is Fatal to Their Claims

 The AC also fails to plead that Plaintiffs relied in any way on Defendants' alleged wrongdoing. This omission is fatal to Plaintiffs' claims under Sections 9(a), 10(b) and 18 of the Exchange Act. *See Stoneridge*, 552 U.S. at 159, 128 S.Ct. 761 (Section 10(b)); *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105–08 (2d Cir.2007) (manipulation claim under Section 10(b)); *Baum v. Phillips, Appel & Walden, Inc.*, 648 F.Supp. 1518, 1530 (S.D.N.Y.1986) (Section 9); *Stromfeld v. Great Atl. & Pac. Tea Co.*, 484 F.Supp. 1264, 1268–69 (S.D.N.Y.1980) (Section 18). As the Supreme Court recently observed, "[reliance] ensures that, for liability to arise, the 'requisite causal connection between a defendant's misrepresentation and

a plaintiff's injury' exists as a predicate for liability." *Stoneridge*, 552 U.S. at 159, 128 S.Ct. 761 (citations omitted).

That connection is entirely missing here. Indeed, nowhere in the AC is there any mention that the Financial Institution Defendants did anything that influenced Plaintiffs' conduct. Plaintiffs claim that they "were either precluded from selling their stock or were forced to sell the stock at a diminished price." AC ¶ 6. But they never tie any of their own actions to anything the Financial Institution Defendants purportedly did. As to the Plaintiffs who allegedly were "precluded from selling their stock" altogether, the AC admits that these Plaintiffs did not take any action and, therefore, could not have relied on the Financial Institution Defendants' alleged statements. Moreover, because it is well-established that the "[m]ere retention of securities during a period of an alleged violation does not satisfy the [purchaser-seller] requirement," *Sanders v. Thrall Car Mfg. Co.*, 582 F.Supp. 945, 963 (S.D.N.Y.1983) (internal quotation marks omitted), those Plaintiffs have pled themselves out of their claims.[12]

 Nor can Plaintiffs invoke a presumption of reliance. To start, that presumption is not available for Section 18 claims. *In re Alstom SA Sec. Litig.*, 406 F.Supp.2d 433, 479 (S.D.N.Y.2005) ("Section 18 requires actual, or what has some-

---

11. Plaintiffs contend that *Dura* is "not applicable to Plaintiffs' case" because "Plaintiffs are claiming deflated price of stock." (Opp'n ¶ 47.) This is a distinction without a difference. *Dura* requires a plaintiff to allege a "causal connection between the [alleged manipulation or] material misrepresentation and the loss" regardless of whether the alleged loss is based on an inflated or deflated share price. *Dura*, 544 U.S. at 342, 125 S.Ct. 1627.

12. It is well established under the Exchange Act that standing is limited to actual purchas-

ers or sellers of securities. *Blue Chip Stamps*, 421 U.S. at 749, 95 S.Ct. 1917; see *Caiola v. Citibank, N.A.*, 295 F.3d 312, 321–22 (2d Cir. 2002). A plaintiff "may recover only for losses that result from decisions to buy or sell, not from decisions to hold or refrain from trading." *First Equity Corp. of Fla. v. Standard & Poor's Corp.*, 869 F.2d 175, 180 n. 2 (2d Cir.1989); see also *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F.Supp.2d 163, 189–90 (S.D.N.Y.2006).

times been referred to as 'eyeball,' reliance."). *See also Heit v. Weitzen*, 402 F.2d 909, 916 (2d Cir.1968). For Section 9 and Section 10 claims, a rebuttable presumption of reliance may arise in only two circumstances: (1) when there is an omission of a material fact by one with a duty to disclose, and (2) under the fraud-on-the-market doctrine, when the statements at issue become public. *See Stoneridge*, 552 U.S. at 159, 128 S.Ct. 761. To invoke a presumption of "fraud on the market," a plaintiff must specifically plead that the market in which he or she purchased the shares was efficient, which the AC fails to do. *See In re Citigroup*, 700 F.Supp.2d at 306–07. Likewise, Plaintiffs do not allege that any of the Financial Institution Defendants had a duty to disclose a material fact, but failed to do so. To the contrary, Plaintiffs fail entirely to allege any link between the Financial Institution Defendants' purported actions and their own.

In their Opposition, Plaintiffs argue that "the SulphCo stockholders relied on the misstatement of Defendants which was published in the [*Barron's*] article and relying on that they started selling the stocks." (Opp'n ¶ 18.) They also assert that Plaintiffs' decisions to sell or hold their SulphCo shares were "influenced by Defendants [sic] conduct." (*Id.* SI 54.) As an initial matter, Plaintiffs have not identified any statement, much less a misstatement, by any Financial Institution Defendant in the *Barron's* article. More fundamentally, Plaintiffs' mere say-so in their Opposition that they relied on that article or were "influenced" by the Financial Institution Defendants' conduct, without anything more, is insufficient to allege reliance, which is fatal to all of Plaintiffs' claims under the federal securities laws. Nor can Plaintiffs avail themselves of a presumption of reliance. (*Id.* ¶ 53.)

Again, the AC does not allege that any Financial Institution Defendant had a duty to disclose a material fact, but failed to do so, or that Plaintiffs purchased their SulphCo shares in an efficient market.

### 6. Plaintiffs' Reliance on "Aiding and Abetting" is Outdated and Misplaced

▆▆▆ Plaintiffs' Opposition makes clear that they seek to rely on an aiding and abetting theory. (*See* Opp'n ¶¶ 30, 37, 43, 45, 55, 56.) The Supreme Court, however, squarely rejected such a claim in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), "hold[ing] that a private plaintiff may not maintain an aiding and abetting suit under § 10(b)." As authority for their unfounded theory, Plaintiffs attempt to rely on some unspecified decision in the *Enron* litigation permitting the suit against the defendant banks to proceed. (Opp'n ¶¶ 31–32.) That reliance is misplaced. Following the Fifth Circuit's decision in *Regents of the University of California v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372 (5th Cir.2007), and the Supreme Court's decision in *Stoneridge Investment Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008), the *Enron* court granted the banks' motion for summary judgment on the ground that the banks, as secondary actors, could not be liable under the securities laws. *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 610 F.Supp.2d 600, 607 (S.D.Tex. 2009).

### B. *Plaintiffs Have Not Adequately Pled the Elements of Control Person Liability* [13]

▆▆▆ To state a claim under Section 20(a) of the Exchange Act, Plaintiffs must

---

**13.** In their Opposition, Plaintiffs appear to

confuse control person liability under Sec-

allege "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in a meaningful sense, a culpable participant in the controlled person's fraud." *ATSI,* 493 F.3d at 108; *see also SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d Cir.1996). Plaintiffs have failed to satisfy any of these elements.

First, as discussed above, Plaintiffs have failed to state an underlying primary violation of the federal securities laws, which is grounds for dismissal of Plaintiffs' Section 20 claim against the Financial Institution Defendants. *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 207 (2d Cir.2009); *see also Bui v. Indus. Enters. of Am.,* 594 F.Supp.2d 364, 372 (S.D.N.Y. 2009); *Tabor v. Bodisen Biotech, Inc.,* 579 F.Supp.2d 438, 453 (S.D.N.Y.2008).

Second, the AC does not allege any facts to support the allegation that the Financial Institution Defendants "controlled" any primary violator of the securities laws. To avoid dismissal, a "complaint must allege facts from which it can be inferred that the defendant had actual power or influence over the controlled person." *Harrison,* 2007 WL 582955, at *19. "[T]he Section 20(a) defendant must not only have actual control over the primary violator, but have 'actual control over the *transaction* in question.'" *In re Alstom SA Sec. Litig.,* 406 F.Supp.2d at 487 (emphasis in original)

(quoting *In re Global Crossing Ltd. Sec. Litig.,* No. 02–CV–910, 2005 WL 1875445, at *3 (S.D.N.Y. Aug. 5, 2005)). The AC here pleads no such facts. Instead, Plaintiffs baldly assert that the Financial Institution Defendants "controlled person and persons who aided and abetted violations of the above referenced laws," without ever identifying the "person and persons" whom the Financial Institution Defendants supposedly controlled. AC ¶ 67. Given the absence of any factual allegations from which it can be inferred that the Financial Institution Defendants had actual power or influence of a primary violator of the securities laws, Plaintiffs' Section 20(a) claim is insufficient as a matter of law.

■ Finally, Plaintiffs fail adequately to plead that any Financial Institution Defendant culpably participated in any alleged fraud. To allege culpable participation, Plaintiffs must plead at a minimum particularized facts establishing a controlling person's conscious misbehavior or recklessness in the sense required by Section 10(b). See *Kalin v. Xanboo, Inc.,* No. 04–CV–5931, 2009 WL 928279, at *12 (S.D.N.Y. Mar. 30, 2009); *In re Alstom SA Sec. Litig.,* 406 F.Supp.2d at 490. Those allegations are entirely lacking here. *See Edison Fund,* 551 F.Supp.2d at 231 (dismissing Section 20(a) claim where plaintiffs "do not allege particularized facts as to [defendant's] participation in the fraud").

tion 20 with aiding and abetting liability under Section 10(b). (*See* Opp'n ¶¶ 55–56.) As to the former, Plaintiffs must allege facts to support the allegation that the Financial Institution Defendants "controlled" a primary violator of the securities laws and "culpably participated" in such a violation. *See Edison Fund,* 551 F.Supp.2d at 231 (dismissing Section 20(a) claim where plaintiffs "do not allege particularized facts as to [defendant's] participation in the fraud"); *Cohen v. Citi-*

*bank, N.A.,* 954 F.Supp. 621, 630 (S.D.N.Y. 1996) (dismissing Section 20(b) claim because that section "requires a showing that a 'controlling person knowingly used the controlled person to commit the illegal act.' "). Plaintiffs allege no such facts. As to the latter, as explained above, "a private plaintiff may not maintain an aiding and abetting suit under § 10(b)." *Central Bank of Denver,* 511 U.S. at 191, 114 S.Ct. 1439.[18]

## V. PLAINTIFFS STATE LAW CLAIMS ARE DISMISSED

### A. The Court Does Hot Have Diversity Jurisdiction Over Plaintiffs' State–Law Claims, and the Circumstances Do Hot Warrant the Exercise of Supplemental Jurisdiction

Plaintiffs also assert state-law claims against the Financial Institution Defendants for conspiracy and common law fraud. Plaintiffs wrongly allege that this Court has diversity jurisdiction over these claims "because Plaintiffs and the currently known Defendants are citizens of different states." AC ¶ 33.

Under 28 U.S.C. § 1332(a), there must be "complete diversity between all plaintiffs and all defendants" for diversity jurisdiction to exist. *Cushing v. Moore,* 970 F.2d 1103, 1106 (2d Cir.1992). Where any plaintiff is a citizen of the same state as any defendant, diversity jurisdiction is defeated. *See Harsco Corp. v. Segui,* 91 F.3d 337, 348 n. 8 (2d Cir.1996). Here, it is clear from the face of the AC that complete diversity does not exist. According to the AC, plaintiff Vertical Ventures, LLC is "duly organized and existing under and by virtue of the laws of the State of Delaware." AC ¶ 13. The AC likewise alleges that *ten* of the Defendants are "duly organized and existing under and by virtue of the laws of the State of Delaware." *Id.* ¶¶ 21–30.[14] Accordingly, complete diversity does not exist and diversity jurisdiction does not exist over Plaintiffs' state-law claims.

Nor will supplemental jurisdiction be exercised over Plaintiffs' state-law claims. "A district court may decline to exercise supplemental jurisdiction when it dismisses all claims over which it has original jurisdiction." *Ernst & Co. v. Marine Midland Bank, N.A.,* 920 F.Supp. 58, 62 (S.D.N.Y.1996) (citing 28 U.S.C. § 1367(c)(3)). The decision to exercise supplemental jurisdiction is at the discretion of the Court, and "when [federal] claims are dismissed before trial, the balance of factors will tilt towards declining to exercise jurisdiction." *Shahzad v. H.J. Meyers & Co.,* 923 F.Supp. 57, 61 (S.D.N.Y.1996). The presumption against exercising supplemental jurisdiction is particularly strong where, as here, the Court and the parties "have invested little effort on litigating the supplemental claims." 13D Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3567.3 (3d ed.2008); *see also Alex. Brown & Sons Inc. v. Marine Midland Banks, Inc.,* No. 96–CV–2549, 1997 WL 97837, at *7 (S.D.N.Y. Mar. 6, 1997) (declining to exercise supplemental jurisdiction after federal securities claims dismissed as insufficiently pled).

### B. Plaintiffs Fail to State a Claim fox Common–Law Fraud or Conspiracy

Even if supplemental jurisdiction over Plaintiffs' state-law claims was appropriate, those claims fail to state a claim under Rule 12(b)(6), Fed.R.Civ.P. The elements of common-law fraud are "essentially the same" as those for a violation of Section 10(b) of the Exchange Act. *In re Pfizer*

---

**14.** For purposes of diversity jurisdiction, "a corporation is deemed to be a citizen of both the state in which it is incorporated and the state in which it has its principal place." *Universal Licensing Corp. v. Paola del Lungo S.p.A.,* 293 F.3d 579, 581 (2d Cir.2002) (citing 28 U.S.C. § 1332(c)(1)). It is also noteworthy that the majority of the Plaintiffs claim to be residents of New York. AC ¶¶ 7–10, 12, 14–17. Although the Complaint is silent about the Defendants' principal places of business, many of the Financial Institution Defendants have their principal places of business in New York.

*Inc. Sec. Litig.,* 584 F.Supp.2d 621, 643 (S.D.N.Y.2008) (internal quotation marks omitted). As held above, Plaintiffs have failed to allege essential elements of a fraud claim, including scienter, reliance and a material misrepresentation or omission. Moreover, Plaintiffs have failed to allege fraud with the requisite particularity required by New York law. *See Callas v. Eisenberg,* 192 A.D.2d 349, 595 N.Y.S.2d 775, 776 (1993) (fraud claim "should be dismissed as insufficient where the claim is unsupported by specific and detailed allegations of fact in the pleadings"); *In re Pfizer Inc. Sec. Litig.,* 584 F.Supp.2d at 644 (New York "continues to require that fraud claims allege reliance and be stated in detail.") (citation omitted). Plaintiffs' vague and conclusory allegations of a "fraudulent scheme to deflate SulphCo's stock price" are insufficient to state a claim for fraud under New York law. AC ¶ 78.

■■■■ Because Plaintiffs have not stated a claim for fraud, their conspiracy claim also fails as a matter of law. A plaintiff must adequately allege a primary underlying tort to state a claim for civil conspiracy under New York law. *See Best Cellars, Inc. v. Grape Finds at Dupont, Inc.,* 90 F.Supp.2d 431, 446 (S.D.N.Y.2000); *see also Agostini v. Sobol,* 304 A.D.2d 395, 757 N.Y.S.2d 555, 556 (2003) ("[C]onspiracy to commit a fraud is never of itself a cause of action"); *Sokol v. Addison,* 293 A.D.2d 600, 742 N.Y.S.2d 311, 312 (2002) (same). A claim for conspiracy also requires an alleged agreement between at least two defendants "to effectuate an unlawful purpose." *Sluys v. Gribetz,* 842 F.Supp. 764, 767 (S.D.N.Y.), *aff'd,* 41 F.3d 1503 (2d Cir.1994). Other than general and conclusory allegations that certain unspecified defendants entered into a scheme to manipulate the price of SulphCo stock (AC ¶¶ 51, 71), Plaintiffs have failed to plead any facts establishing an agreement that includes the Financial Institution Defendants. With no adequate allegations of an agreement, Plaintiffs' claim for civil conspiracy should be dismissed for this additional reason as well. *See NCA Holding Corp. v. Ernestus,* No. 97–CV–1372, 1999 WL 672836, at *3 (S.D.N.Y. Aug. 27, 1999) ("apart from a conclusory allegation, plaintiffs had failed to allege any facts from which the Court [could] determine that there was any common plan or scheme linking the different transactions and defendants together") (internal quotation marks omitted); *Portnoy v. Am. Tobacco Co.,* Nos. 96/16323, 2–MG, 96–16324, 1997 WL 638800, at *7 (Sup.Ct.N.Y. County Sept. 27, 1997) (dismissing conspiracy claim where allegations of an agreement were "purely conclusory"). The conspiracy claim against the Financial Institution Defendants is therefore dismissed.

## VI. *CONCLUSION*

For the foregoing reasons, the AC is dismissed and the Plaintiffs are granted leave to replead.

It is so ordered.