GEORGE B. DANIELS, United States District Judge
Before this Court are Plaintiffs Hudson Bay Master Fund Limited's ("Hudson Bay") and CVI Investments, Inc.'s ("CVII," together with Hudson Bay, the "Funds") motions to dismiss counterclaims filed by Defendants Patriot National, Inc. ("Patriot National") and Steven M. Mariano. (See Hudson Bay's Mot. to Dismiss Defs.' Countercls. ("Hudson Bay Mot."), 16-cv-2767, ECF No. 148; CVII's Mot. to Dismiss Countercls. ("CVII Mot."), 16-cv-2787, ECF No. 81.)[1] In April 2016, the Funds filed, inter alia, breach of contract claims against Defendants involving the purchase and delivery of company shares from Patriot National. (Hudson Bay Compl., ECF No. 1; CVII Compl., ECF No. 1.) On November 21, 2016, this Court struck Defendants' affirmative defenses including those based on fraudulent inducement and market manipulation for inadequate pleading and prejudice to the Funds by dramatically increasing the cost of discovery and trial. (See e.g., Mem. Decision and Order ("Order"), 16-cv-2767, ECF No. 72, at 2.) This Court, however, did not strike Defendants' breach of contract affirmative defenses. Instead, those allegations moved forward as specific denials. (Id. at 15.)
After the Funds filed amended complaints, Defendants amended their answers and included counterclaims similar to the affirmative defenses this Court struck for inadequate pleading. Specifically, Patriot National alleges that the Funds manipulated the market and made material misrepresentations and omissions in violation of Section 10(b) of the Securities Exchange Act of 1934. (Patriot National's Countercls. against Hudson Bay ("Patriot's Hudson Bay Countercls."), ECF No. 122, ¶¶ 48-68; Patriot National's Countercls. against CVII ("Patriot's CVII Countercls."), ECF No. 65, ¶¶ 44-64.) Patriot National also brings common law fraudulent inducement and breach of contract counterclaims against the Funds. (Patriot's Hudson Bay Countercls. ¶¶ 69-84; Patriot's CVII Countercls. ¶¶ 65-80.) In addition to his market manipulation, fraudulent inducement, and breach of contract counterclaims, Defendant Mariano also brings a counterclaim for breach of the duty of *108 good faith and fair dealing against Hudson Bay. (See Mariano's Countercls. against Hudson Bay ("Mariano's Hudson Bay Countercls."), ECF No. 128.)
The Funds move to dismiss Defendants' counterclaims arguing that they are procedurally barred pursuant to the law of the case and for failure to seek leave to amend. (Hudson Bay Mot. at 7-9; CVII Mot. at 8-10.) The Funds also move to dismiss the counterclaims for failure to state a claim for which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rule of Civil Procedure. (Hudson Bay Mot. at 11-25; CVII Mot. at 12-25.)
The motions to dismiss Defendants' counterclaims are GRANTED in part and DENIED in part.[2] Patriot National's market manipulation, material misrepresentation and omissions, and fraudulent inducement counterclaims are DISMISSED. Mariano's market manipulation, fraudulent inducement and breach of the duty of good faith and fair dealing counterclaims are also DISMISSED. Defendants' breach of contract counterclaims remain.[3]
I. FACTUAL AND PROCEDURAL BACKGROUND
On December 13, 2015, Hudson Bay, CVII, and another investor, entered into a Securities Purchase Agreement ("SPA") for a Private Investment in Public Equity ("PIPE") transaction with Defendants Patriot National and its Chief Executive Officer, Mariano. The transaction provided for "the sale to the investors of: (a) $30 million in Patriot stock by Mariano for his own benefit, and (b) $20 million in shares newly issued by Patriot for general corporate purposes." (CVII Am. Compl., ECF No. 56, ¶ 13; see also Hudson Bay Am. Compl., ECF No. 102, ¶ 19.) To account for the "risks and attendant uncertainties in the price of Patriot shares," the Funds negotiated for the grant of a Series B Warrant, which entitled them to additional shares based on a price adjustment mechanism that increased the number of shares available if Patriot National's stock declined over a certain period of time. (CVII Am. Compl. ¶ 19; Hudson Bay Am. Compl. ¶ 5.) Defendants also agreed to grant the Funds a Series A Warrant, which gave the Funds the right to purchase additional Patriot National shares at the lesser of a fixed price of $10 per share or a discount to the market price as of a certain exercise date. (CVII Am. Compl. ¶ 18; Hudson Bay Am. Compl. ¶ 39.)
The Funds allege that upon public disclosure of the transaction, on or about *109 December 14, 2015, Patriot National's stock price sharply declined. (CVII Am. Compl. ¶ 15; Hudson Bay Am. Compl. ¶ 26.) As a result, the parties agreed to restructure the deal, which culminated in a Rescission and Exchange Agreement ("REA" together with the SPA the "Transaction Documents")[4] dated December 23, 2015. (CVII Am. Compl. ¶ 16; Hudson Compl. ¶¶ 26-28.) Under the REA, Patriot National's sale of certain shares to the Funds were rescinded and other terms were renegotiated, but the overall structure of the agreement remained essentially the same and granted the Funds new Series A and B Warrants. (CVII Am. Compl. ¶¶ 16-17; Hudson Bay Am. Compl. ¶¶ 30-33.) After the REA closed, the Funds allege that the price for Patriot National shares again dropped substantially and continued to decline. (CVII Am. Compl. ¶ 42; Hudson Bay Am. Compl. ¶ 49.) The Funds attribute this decline in part to Patriot National's February 24, 2016 earnings announcement for the fourth quarter of 2015, which reported a "worse-than-expected financial performance." (CVII Am. Compl. ¶ 42; Hudson Bay Am. Compl. ¶ 49.)
On April 5, 2016, the Funds sought to partially exercise the Series B Warrant and allege that although they had fully performed their obligations under the contract, Patriot National refused to deliver them the shares.[5] (CVII Am. Compl. ¶¶ 25-26; Hudson Bay Am. Compl. ¶¶ 52, 55.) Patriot National informed the Funds that its refusal to transfer the requested shares was due to an ongoing investigation by the Financial Industry Regulation Authority's Office of Fraud Detection and Market Intelligence. (CVII Am. Compl. ¶¶ 37-38; Hudson Bay Am. Compl. ¶¶ 55-56.)
On April 13, 2016, Hudson Bay filed the instant action against Defendants Patriot National and Mariano for specific performance and breach of contract involving the purchase and delivery of Patriot National shares under the Series B Warrant. (Hudson Bay Compl. ¶¶ 73-85). Hudson Bay also claims tortious interference by Mariano, (id. ¶¶ 93-101), and breach of the duty of good faith and fair dealing against both Defendants. (Id. ¶¶ 86-92.) One day later, on April 14, 2016, CVII filed a related action naming Patriot National as the sole defendant and also alleging breach of contract for a similar failure to deliver shares and asking this Court to enforce specific performance of the contract. (CVII Compl. ¶¶ 42-55.)
Patriot National answered Hudson Bay's Complaint on May 5, 2016 asserting a number of affirmative defenses, including: (i) that "Plaintiff breached (and/or repudiated) the Transaction Documents and the [non-disclosure agreement]"; (ii) fraudulent inducement, and (iii) that the Transaction Documents "are void as against public policy, insofar as they purport to allow Plaintiff to engage in conduct that is prohibited under federal law, including but not limited to insider trading and market manipulation in violation of the federal securities laws." (Patriot National's Ans. to Hudson Bay Compl., ECF No. 26, at 20-22.) Mariano separately answered Hudson Bay's Complaint that same day asserting similar affirmative defenses. (Mariano Ans. to Hudson Bay Compl., ECF No. 19, at 14-17.) On May 6, 2016, Patriot National answered CVII's Complaint asserting substantially the same affirmative defenses as it did in its answer to Hudson Bay's Complaint.
*110 (Patriot National's Ans. to CVII Compl., ECF No. 11, at 12-14.)
The Funds moved for partial judgment on the pleadings as to their respective breach of contract claims pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Hudson Bay's Mot. J. on the Pleadings ("Hudson 12(c) Mot."), ECF No. 32, at 5-14; CVII's Mot. J. on the Pleadings ("CVII 12(c) Mot."), ECF No. 16, at 15-21.) The Funds also moved to strike Defendants' affirmative defenses. (Hudson 12(c) Mot. at 15-24; CVII 12(c) Mot. at 5-15.)
At oral argument and in their opposition papers, Defendants argued that the Funds had failed to perform under the Transaction Documents. (See, e.g., Patriot National Opp'n to Hudson 12(c) Mot. ("Patriot 12(c) Opp'n"), ECF No. 38, at 12.) Defendants argued that their obligations to transfer the stock to the Funds were expressly contingent on certain conditions that, upon information and belief, the Funds had failed to meet. (See, e.g., July 21, 2016, Oral Arg. Tr., ECF No. 60, at 42:8-10.) One of those conditions related to the Non-Disclosure Agreement ("NDA") the Funds entered into prior to signing the SPA. Under the NDA, CVII agreed not to "disclose to any third party or use or permit any third party to use any of the information provided except to evaluate the Proposed transaction." (See, e.g., Patriot 12(c) Opp'n at 3-4.) Hudson Bay agreed not to "engage in transactions, or cause anyone else to engage in transactions, related to Patriot National's securities prior to the public announcement." (Id. )
Upon signing the SPA, the Funds also represented that they had not:
engaged in any transactions in the securities of [Patriot National] (including, without limitation, any Short Sales ... involving the [Patriot National's] securities) during the period commencing as of the time that such Buyer was first contacted by the Company ... regarding the specific investment in the Company contemplated by this Agreement and ending immediately prior to the execution of this Agreement by such Buyer.
(See id. , at 5 (citing SPA § 2(j) ).) Defendants argued that the Funds breached the Transaction Documents by borrowing shares before the December 13, 2015 execution of the SPA and by engaging in short sales during the pricing period for the Warrant. (Id. at 5-8.) Defendants were concerned about the "inexplicable timing of the massive borrowing and shorting that coincided with the NDA and the closing of the Transaction", (id. at 7), and argued that the Funds "were one of the only few people who knew about the possibility of this transaction[.]" (Oral Arg. Tr., 42:19-24.) Therefore, the Funds were the ones responsible for the transactions in violation of their express representations.
Relying on another portion of § 2(j) of the SPA, which specifically excludes "the location and/or reservation of borrowable shares" from the definition of "Short Sales," the Funds disputed any breach on their part, arguing that § 2(j) expressly carves out as permissible the borrowing of shares before disclosure of the transaction. (See, e.g., Fludson Bay's Reply in Supp. of 12(c) Mot. ("Hudson 12(c) Reply"), ECF No. 55, at 3.) The Funds further argued that under the SPA, they were allowed to short once the transaction became public. (Id. ) They argued that pursuant to § 3(a)(xxxii) of the SPA, Defendants acknowledged that " 'Buyers may engage in hedging and/or trading activities ' during the pricing period for the Warrant and that such shorting and other hedging activities 'do not constitute a breach of this Agreement, the Warrants, or any other Transaction Document or any of the documents executed in connection herewith *111 or therewith .' " (Id. (citing SPA § 3(a)(xxxii) ) (emphases in original).)[6]
In denying the Funds' motions for partial judgment on the pleadings, this Court found that "[b]ecause the Transaction Documents only permitted Hudson Bay to participate in short selling after the execution of the Transaction, Patriot's allegations [of borrowing and shorting] raise factual issues inappropriate for resolution at the judgment on the pleadings stage." (Order at 10.) This Court also took issue with the timing of the alleged transactions:
While Patriot alleges that borrowing occurred on November 30, 2015, prior to the December 13, 2015 execution of the SPA, it is unclear whether those borrowed shares actually led to any prohibited short sales prior to December 13....Additionally, the Transaction Documents are unclear whether such prohibitions on borrowing or short selling expired on December 13, 2015 or on December 23, 2015, the execution date of the REA. 'Prior to the execution of this Agreement,' as provided in § 2(j) could mean prior to the signing of the SPA on December 13, 2015. But, because the parties reopened negotiations regarding the SPA shortly thereafter, 'prior to the execution of this Agreement' could also reasonably refer to any time prior to the signing and execution of the REA on December 23, 2015.
(Id. at 10-11.) The decision struck Defendants' affirmative defenses, including those of fraudulent inducement and market manipulation, as insufficient as a matter of law. (Id. at 17.) Defendants' request for leave to amend was denied "since Defendants ... proffered no set of facts to demonstrate that such amendments would not be futile." (Id. )
On January 31, 2017, Hudson Bay filed an amended complaint adding another claim for specific performance, alleging that in early August 2016, Patriot National refused to honor its exercise of the Series A Warrant. (Hudson Am. Compl. ¶¶ 66-69.) Similarly, CVII filed an amended complaint on February 22, 2017 alleging a breach of contract claim for failure to deliver shares pursuant to the Series A Warrant. (CVII Am. Compl. ¶¶ 76-87.) On March 24, 2017, Patriot National filed its answer to the amended complaints and counterclaims in both Hudson Bay and CVII actions. (Patriot's Hudson Bay Countercls., ECF No. 122; Patriot's CVII Countered., ECF No. 65.) Mariano filed an answer to Hudson Bay's amended complaint on March 31, 2017. (See Mariano's Hudson Bay Countercls., ECF No. 128.) Along with their opposition briefs, Defendants also filed proposed amended counterclaims for this Court's consideration. (See Patriot's Hudson Bay Proposed Am. Countercls., ECF No. 162-01; Patriot's CVII Proposed Am. Countercls., ECF No. 93-1; Mariano's Hudson Bay Proposed Am. Countercls., ECF No 164-06.)
*112 II. LEGAL STANDARD
The standard for dismissal of a counterclaim is the same as the standard for dismissal of a complaint. See Aspex Eyewear, Inc. v. Clariti Eyewear, Inc., 531 F.Supp.2d 620, 623 (S.D.N.Y. 2008). To survive a Rule 12(b)(6) motion to dismiss, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (internal quotation marks and citation omitted). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. In deciding a Rule 12(b)(6) motion, the court draws all reasonable inferences in the non-moving party's favor. See N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC, 709 F.3d 109, 119 (2d Cir. 2013) (internal citation omitted).
Allegations of fraud, including securities fraud, must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) by "stat[ing] with particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b) ; see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). A complaint alleging securities fraud must also meet the requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), which requires that a complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is based on information or belief, the complaint shall state with particularity all facts on which that belief is formed." ATSI, 493 F.3d at 99.
III. DEFENDANTS SUFFICIENTLY ALLEGE BREACH OF CONTRACT CLAIMS
To state a claim for breach of contract in New York, a plaintiff must show "(1) the existence of a contract, (2) performance by the party seeking recovery, (3) non-performance by the other party, and (4) damages attributable to the breach." RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC., 156 Fed. Appx. 349, 350-51 (2d Cir. 2005).
Defendants have sufficiently alleged a breach of contract claim against the Funds. Defendants allege that in late 2015, Patriot National sought to raise capital through a PIPE transaction.[7] They argue that such transactions are "frequently viewed negatively by the market because they are perceived to be used by companies desperate for financing." (Patriot National's Opp'n to Funds' Mots, to Dismiss (Patriot Opp'n), ECF No. 162, at 9.) Defendants allege that upon executing the NDA in which the Funds agreed not to disclose to any third party or use any information provided to "trade in [Patriot National] securities," the Funds immediately began "paying-for-hold and borrowing" Patriot National stock.[8] This conduct, Defendants allege, also violated the SPA
*113 whereby the Funds represented they had not engaged in any transactions of Patriot National securities between the time they executed the NDA and the announcement of the PIPE.[9] Defendants allege that the Funds also breached the REA by falsely representing that they had not engaged in any transactions between the execution of the SPA and the REA, even though they borrowed and shorted Patriot National shares during such period.[10]
Defendants point to the specific provisions violated and the amount of shares allegedly borrowed and shorted by the Funds:
• Hudson Bay breached the express terms, including Sections 2(j) and 6(a)(iii) of the SPA and Section 3(b) of the REA, by borrowing 2,190,000 shares of Patriot National stock through Pay-To-Hold transactions ... during the period of December 1, 2015 through December 13, 2015.[11]
• Hudson Bay further breached the Transaction [Documents] ... by selling short 191,417 shares of Patriot National stock during the period of December 14, 2015 through December 17, 2015.[12]
• CVII breached the express terms of the Transaction [Documents], including Sections 2(j) and 6(a)(iii) of the SPA and Section 3(b) of the REA, by borrowing 1,351,400 shares of Patriot National stock during the period of December 1, 2015 through December 14, 2015.[13]
• CVII further breached the Transaction Agreements ... by selling short 6,975 shares of Patriot National stock during the period of December 14, 2015 through December 17, 2015.[14]
Accepting all allegations as true, as is required under Rule 12(b)(6), Defendants have alleged enough for their breach of contract claims to survive. Whether borrowing Patriot National stock was a prohibited action under the Transaction Documents and whether such agreements prohibited short selling between the time the parties executed the SPA and later the REA, are ambiguities not appropriate for resolution at the motion to dismiss stage.
The Funds argue that Defendants' breach of contract counterclaims fail to plead damages. (Hudson Bay Mot. at 25; CVII Mot. at 24.) However, as the Second Circuit explained "[e]ven if [Plaintiff's] allegations of substantial damages [are], as Defendants argue, too 'speculative' to support its claims, [Plaintiff] would have plausible claims for nominal damages." Luitpold Pharms., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie, 784 F.3d 78, 86-87 (2d Cir. 2015) (finding defendants' argument that plaintiff failed to adequately plead damages unpersuasive and vacating district court's judgment dismissing breach of contract claims); see also *114 T & N PLC v. Fred S. James & Co. of N.Y., 29 F.3d 57, 60 (2d Cir. 1994) (stating that under New York law, "nominal damages are always available for breach of contract.").
As such, the Funds motions to dismiss the breach of contract counterclaims are denied and the claims remain.[15]
IV. DEFENDANT MARIANO'S CLAIM FOR BREACH OF THE DUTY OF GOOD FAITH AND FAIR IS DUPLICATIVE OF HIS BREACH OF CONTRACT CLAIM
"Under New York law, every contract includes an implied covenant of good faith and fair dealing." Cohen v. Elephant Wireless, Inc., No. 03-cv-4058 (CBM), 2004 WL 1872421, at *11 (S.D.N.Y. Aug. 19, 2004) (internal citation omitted). Because breach of the covenant is "merely a breach of the underlying contract," Fasolino Foods Co. v. Banca Nazionale Del Lavoro, 961 F.2d 1052, 1056 (2d Cir. 1992), "as a general rule, the cause of action alleging breach of the implied covenant is duplicative of a cause of action alleging breach of contract." OHM Remediation Servs. Corp. v. Hughes Envtl. Sys., Inc., 952 F.Supp. 120, 124 (N.D.N.Y. 1997) (internal citations omitted). Mariano relies upon the same alleged contractual violations as in his breach of contract claim.[16] As such, his breach of the duty of good faith and fair dealing claim is dismissed as duplicative.
V. DEFENDANTS' MISREPRESENTATION AND FRAUDULENT INDUCEMENT CLAIMS ARE DUPLICATIVE OF THEIR BREACH OF CONTRACT CLAIMS
Defendants allege material misrepresentation under Section 10(b) of the Securities Exchange Act and a common-law theory of fraudulent inducement.[17] "Under New York law, a re-styling of contract claims does not create an independent claim for fraud and New York courts have dismissed such claims as duplicative." Torchlight Loan Servs., LLC v. Column Fin., Inc., No. 11-cv-7426 (RWS), 2012 WL 3065929, at *9 (S.D.N.Y. July 25, 2012) ; see also LaSalle Bank Nat'l Ass'n Citicorp Real Estate, Inc., No. 01-cv-4389 (AGS), 2002 WL 31729632, at *12 (S.D.N.Y. Dec. 5, 2002) (dismissing as duplicative fraud claim that "stems directly from its breach of contract claim"). "[T]he mere allegation that a defendant did not intend to perform a contract with a plaintiff when he made it generally fails to state a claim for fraud[.]" VTech Holdings Ltd. v. Lucent Techs., Inc., 172 F.Supp.2d 435, 439 (S.D.N.Y. 2001) (internal quotation marks and citation omitted). "The rationale for this rule is that a party need not be expressing an unconditional intention to perform by contracting, and may instead be expressing an intention either to perform or suffer the ordinary contractual consequences for a breach." Id. (internal citation omitted). Were a party to breach a contract, "the party [could] be required to *115 pay contract damages whether or not the party intended to perform the contract at the outset." Id. (internal citation omitted).
Defendants base their fraud claims on the following alleged misrepresentations and omissions that they contend induced them to enter the SPA and REA:
(i) the Funds failure to disclose their then-present intention to begin borrowing Patriot National shares immediately upon signing their respective NDAs and receipt of material non-public information; (ii) the Funds' failure to disclose that they had borrowed millions of shares of Patriot stock in violation of the NDAs, between the time the NDAs were executed and the time the SPA was executed; and (iii) the Funds' continued failure to disclose any information regarding their own conduct in contributing to the stock's decline-instead, using the decline to renegotiate the agreement and enter into the REA.
(See Patriot Opp'n at 17; see also Mariano Opp'n at 24.) Defendants argue that their fraud claims survive because the misrepresentations and omissions were of then "present facts (as opposed to future facts)." (See e.g., Patriot Opp'n at 16.) "However, it is not sufficient that the alleged misrepresentations are about then-present facts; rather, they also must be 'extraneous to the contract and involve a duty separate from or in addition to that imposed by the contract.' " Torchlight, 2012 WL 3065929, at *10 (internal citation omitted); see also Savasta & Co. v. Interactive Planet Software, Inc., No. 0602425/2005, 2008 WL 2563485, 2008 N.Y. Misc. LEXIS 9445 at *8-9 (N.Y. Sup. Ct. June 13, 2008) (holding that where alleged "misrepresentations of ... present fact ... fall exactly within the warranties," they "are not extraneous to the Agreement" and cannot support a fraud claim).
Here, the alleged misrepresentations and omissions are expressly addressed by the Transaction Documents. For instance, whether the Funds failed to disclose their "then-present intention" to borrow Patriot National shares upon signing the NDA is not "extraneous to the Agreement." It goes to whether the Funds intended to uphold their agreement not to "engage in transactions ... related to Patriot National's securities[,]" or instead "suffer the ordinary contractual consequences for a breach[.]" VTech Holdings Ltd., 172 F.Supp.2d at 439. It also goes to whether the Funds actually breached the NDA through the alleged nondisclosure. Similarly, whether the Funds had a duty to disclose that they had borrowed shares, falls within the SPA and REA representations that they had not engaged in any transactions since signing the NDA.
Given that Defendants' fraud claims stem directly from their breach of contract claims, those claims are duplicative and are dismissed.
VI. DEFENDANTS' MARKET MANIPULATION CLAIMS FAIL
Defendants also allege that the Funds manipulated the market in violation of the federal securities laws by "borrowing (and causing others to borrow) and shorting Patriot's stock on the basis of nonpublic information." (See Patriot Opp'n at 6-7.)
"Section 10(b) of the Securities Exchange Act imposes private civil liability on those who commit a manipulative or deceptive act in connection with the purchase or sale of securities." Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 166, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). A claim of market manipulation under Section 10(b) and Rule 10b-5 "requires a plaintiff to allege (1) manipulative acts; (2) damage; (3) caused by reliance on an assumption of *116 an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." ATSI, 493 F.3d at 101.
Since a market manipulation claim is a claim of fraud, it must be pled with particularity under Rule 9(b). Id. (internal citations omitted). "A claim of manipulation, however, can involve facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." Id. at 102 (internal citations omitted). What must be pled with particularity is the "nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." Id. (internal citations omitted). This is met when the complaint alleges "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." Id. (citing Baxter v. A.R. Baron & Co., No. 94-cv-3913 (JGK), 1995 WL 600720, at *6 (S.D.N.Y. Oct. 12, 1995) ).
Defendants fail to sufficiently allege market manipulation claims.
A. Manipulative Conduct
The term "manipulative" is "virtually a term of art when used in connection with securities markets [that] connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). "The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." ATSI, 493 F.3d at 100. A wash sale, for instance, is a form of fictitious transaction "involving no change in beneficial ownership." Ernst & Ernst, 425 U.S. at 205 n.25, 96 S.Ct. 1375. Matched orders are "orders for the purchase [or] sale of a security that are entered with the knowledge that orders of substantially the same size, at substantially the same time and price, have been or will be entered by the same or different persons for the sale [or] purchase of such security." Id. Such transactions are inherently fraudulent as they create an artificial appearance of activity in the market. See Section 9(a)(1) of the 1934 Act, 15 U.S.C. § 78i(a)(1) (proscribing wash sales and matched orders when effectuated "[f]or the purpose of creating a false or misleading appearance of active trading[.]").
The "gravamen of manipulation", therefore, is "deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." Wilson v. Merrill Lynch & Co. , 671 F.3d 120, 130 (2d Cir. 2011). "In identifying activity that is outside the 'natural interplay of supply and demand,' courts generally ask whether a transaction sends a false pricing signal to the market." ATSI, 493 F.3d at 100. "[S]hort selling-even in high volumes-is not, by itself, manipulative."[18] Id. at 101. "An investor sells short when he sells a security that he does not own by borrowing the security, typically from a broker" and later "covers his short position by purchasing the security and returning it to the lender."
*117 S.E.C. v. Badian, No. 06-cv-2621 (LTS) (DFE), 2008 WL 3914872, at *1 (S.D.N.Y. Aug. 22, 2008) (internal citation and quotation marks omitted). "If the price drops, the investor profits by covering for less than the short sale price." Id. "Aside from providing market liquidity, short selling enhances pricing efficiency by helping to move the prices of overvalued securities toward their intrinsic values." ATSI , 493 F.3d at 101 (internal citations omitted). As such, "[t]o be actionable as a manipulative act, short selling must be willfully combined with something more to create a false impression of how market participants value a security." Id.
Defendants allege that based on material nonpublic information, the Funds borrowed over 42% of Patriot National's shares by the time the PIPE deal was announced and that they did so in preparation for massive short sales once the deal closed.[19] Defendants further allege that once the deal became public, the Funds' short selling contributed to the drastic decline of Patriot National's share price.[20] According to Defendants, the Funds manipulated the market for Patriot National stock to substantially increase the number of shares they could obtain through the Series B Warrant at artificially depressed prices.[21]
As an initial matter, Defendants cannot argue that they were unaware that the Funds contemplated engaging in short selling because both the SPA and the REA specifically allowed the Funds to short an unrestricted amount of Patriot National stock after public disclosure of the deal.[22] (See Section 3(a)(xxxii) allowing the Funds to engage in "any transactions in or with respect to (including, without limitation, purchasing or selling, long and/or short) any securities of the Company" after public disclosure of the deal.) That coupled with the fact that short selling alone is not manipulative, Defendants have to allege "something more" in order for their manipulation counterclaims to survive. Defendants argue that they have alleged something more than short selling-the borrowing in large quantities of Patriot National stock while in possession of material nonpublic information. (See Patriot Opp'n at 11.) However, Defendants point to no case where borrowing shares in preparation to engage in contractually permissible short selling amounted to manipulative conduct.
Defendants' reliance on CompuDyne Corp. v. Shane is inapposite. There, after agreeing to maintain the existence of the PIPE confidential, defendant shorted CompuDyne stock before even signing the purchase agreement and before the PIPE
*118 became public. 453 F.Supp.2d 807, 815-16 (S.D.N.Y. 2006). CompuDyne alleged that defendant knew at the time they were engaging in such transactions that plaintiffs were gauging investor interest in the PIPE to determine the market price discount at which to offer the PIPE shares. Id. at 815. After signing the purchase agreement and following public announcement of the PIPE, defendants engaged in naked short-selling and covered their combined short position with the CompuDyne stock purchased in the PIPE, reaping allegedly over $1 million in illegal profits. Id. at 816. Plaintiffs further alleged that the "unlawful short selling artificially depressed the price and contributed to the volatility of CompuDyne stock during the crucial period during which the PIPE was being priced, and that as a result, Plaintiffs received less from the PIPE offering than they would have had the price of CompuDyne stock not been so manipulated." Id. at 822.
Here, Defendants' market manipulation allegations are not comparable to those found to be sufficient in CompuDyne. In CompuDyne, unlike here, defendants used nonpublic information to engage in short-selling before the PIPE was announced. Id. at 815-16. Here, by the time the Funds shorted Patriot National shares, the existence of the PIPE had already been made public and therefore, the Funds were not acting upon any information that was not available to the investing public at-large. The timing of the short-selling in CompuDyne was particularly important because it occurred when plaintiffs were pricing the PIPE. Id. at 815. These distinctions are material because it supports a finding that defendants' short sales in CompuDyne were "send[ing] a false pricing signal to the market," ATSI, 493 F.3d at 100, thereby ultimately affecting the PIPE pricing itself. Defendants here fail to allege how the Funds' authorized short-selling, after the public announcement of the PIPE, deceived investors or sent a false pricing signal in the market for Patriot National shares.
Furthermore, in CompuDyne, unlike here, defendants allegedly engaged in naked short sales, a practice regulated by the SEC because it " 'can serve as a tool to drive down a company's stock price'-which, of course, injures shareholders[.]" Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Manning , --- U.S. ----, 136 S.Ct. 1562,1566, 194 L.Ed.2d 671 (2016) (internal citations omitted) ("In a 'naked' short sale, by contrast [to a short sale], the seller has not borrowed (or otherwise obtained) the stock he puts on the market, and so never delivers the promised shares to the buyer.... The SEC regulates such short sales at the federal level ... prohibit[ing] short sellers from intentionally failing to deliver securities and thereby curbs market manipulation.") (citing 17 CFR §§ 242.203 - 242.204 (2015) ). The "something more" in CompuDyne not only included short selling based on nonpublic information, but also a practice the SEC finds prone to manipulation.
The other cases Defendants rely upon allege manipulative acts that are beyond anything Defendants allege here. See Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC., No. 02-cv-0767 (LBS), 2002 WL 31819207, at *2 (S.D.N.Y. Oct. 10, 2002) (defendants alleged to be exploiting the reset rights in financing agreement via short-selling, pre-arranged sales, and painting the tape); see also In re Initial Pub. Offering Sec. Litig., 241 F.Supp.2d 281, 293, 311 (S.D.N.Y. 2003) (the "vast scheme to defraud the investing public" included tie-in agreements for aftermarket purchases which the SEC has described as "manipulative because they undermine the integrity of the market as an independent pricing mechanism for the offered *119 security. ") (internal citation omitted) (emphasis in original). Defendants' allegations do not amount to manipulative conduct.
B. Scienter
Because a claim for market manipulation requires a showing of scienter, the "PSLRA's heightened standards for pleading scienter" apply. ATSI, 493 F.3d at 102. "This pleading requirement is particularly important in manipulation claims because in some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation." Id. " 'Conclusory statements of associations' or generalized allegations of scienter against groups of defendants will not state a claim for securities fraud." Cohen v. Stevanovich , 722 F.Supp.2d 416, 428 (S.D.N.Y. 2010) (internal citation omitted). Specific facts must be plead as to each defendant that "(1) give rise to a strong inference that the defendant had both motive and opportunity to commit fraud or (2) provide strong circumstantial evidence of 'conscious misbehavior or recklessness.' " Id. (citing Ganino v. Citizens Utils. Co., 228 F.3d 154, 168-69 (2d Cir. 2000) ).
Defendants argue that they have adequately plead scienter "by identifying the Funds' motive and opportunity to commit fraud." (Patriot Opp'n at 13; Marino Opp'n at 19.) The Funds' alleged motive was to profit from their manipulative borrowing and short selling and to drive down Patriot National's share price in order to access additional shares under the Series B Warrants at lower prices. (Id. ) "Plaintiff's scienter allegations [however,] fall short of the motive and opportunity standard because they amount to no more than allegations of a general business motive to make a profit." In re Merrill Lynch Auction Rate Sec. Litig. , 851 F.Supp.2d 512, 528 (S.D.N.Y. 2012)aff'd sub nom. Louisiana Pac. Corp. v. Merrill Lynch & Co., 571 Fed. Appx. 8 (2d Cir. 2014). See Cohen, 722 F.Supp.2d at 429 (courts have "repeatedly rejected" "generalized profit-seeking motives" in pleading scienter) (emphasis added). Given that "it is assumed that all commercial businesses seek to make money, claims that amount to 'no more than allegations of a general business motive to make a profit,' ... cannot support an inference of scienter." Sharette v. Credit Suisse Int'l, 127 F.Supp.3d 60, 95 (S.D.N.Y. 2015) (internal citation omitted); see also Edison Fund v. Cogent Inv. Strategies Fund, Ltd., 551 F.Supp.2d 210, 227 (S.D.N.Y. 2008) ("To accept a generalized allegation of motive based on a desire to continue to obtain management fees would read the scienter requirement out of the statute"); cf. Sharette, 127 F.Supp.3d at 96 (motives alleged "encompass[ed] larger and longer-term financial ends" such as "access [to] a specific and extremely profitable market, potentially worth billions of dollars.").
In addition, "to determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct." Alki Partners, L.P. v. Vatas Holding GmbH, 769 F.Supp.2d 478, 494 (S.D.N.Y. 2011), aff'd sub nom. Alki Partners, L.P. v. Windhorst, 472 Fed.Appx. 7 (2d Cir. 2012) (citing Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323-24, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) ). "The inference of scienter 'need not be irrefutable,' " but "must be more than merely reasonable or permissible-it must be ... cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Alki, 769 F.Supp.2d at 494 (internal citation and quotation marks omitted). "In determining whether this standard has been met, a court must consider 'whether all of the *120 facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.' " Id. (internal citation omitted).
There is another "plausible nonculpable explanation" for the Funds' conduct. Given the risky nature of PIPE transactions (i.e. the potential of the market reacting negatively to the deal), it is plausible that the Funds' borrowing and shorting of Patriot National stock "represented legitimate hedging against [their] very large long position." (CVII Mot. at 23; see also Hudson Bay Mot. at 20.) Indeed, not only did Defendants expressly agree to permit the Funds to short once the deal was announced, Defendants acknowledged that any such "hedging and/or trading activities" could affect the value and number of shares owed under the Warrants and dilute shareholder equity, but would not constitute a breach of the agreement as a result. (SPA § 3(a)(xxxii) ); see ATSI, 493 F.3d at 104 ("A strong inference of scienter is not raised by alleging that a legitimate investment vehicle ... creates an opportunity for profit through manipulation."). Another plausible explanation stems from the primary dispute in this action-the Funds' belief that their conduct was expressly permitted by the Transaction Documents (whether accurate or not). (See, e.g., Hudson Bay Mot. at 14 (arguing that § 2(j) of the SPA "expressly authorized [the Funds] to reserve Patriot stock ahead of the deal going public, and to short it afterwards.").) Considering these plausible alternative nonculpable explanations, Defendants have failed to allege a strong inference of scienter to survive a motion to dismiss.
C. Reliance
Even if Defendants properly alleged manipulative conduct and scienter, their claims nonetheless fail because they do not allege "reliance" based upon "an assumption of an efficient market free of manipulation" as required under Section 10(b).See ATSI, 493 F.3d at 101. Defendants allege had they "known the truth regarding [the Funds'] true intentions with respect to the PIPE Transaction, or had [they] known the extent of [the Funds'] trading activities, [they] would never have entered the Transaction." (Mariano's Hudson Bay Proposed Am. Countercls. ¶ 87; see Patriot's Hudson Bay Proposed Am. Countercls. ¶ 59.) Assuming, arguendo, that the Funds' borrowing of Patriot National shares constituted an impermissible transaction, Defendants fail to allege, let alone explain, how the mere borrowing prior to the deal becoming public "mislead investors by artificially affecting market activity." ATSI, 493 F.3d at 100. Furthermore, any argument by Defendants that they were unaware of the Funds' intent to engage in short selling at any point after the transaction was executed, is unpersuasive given the SPA's and REA's express carve out related to short sales.
VII. CONCLUSION
Hudson Bay's and CVII's motions to dismiss Patriot National's market manipulation, material misrepresentation and omissions, and fraudulent inducement counterclaims are GRANTED. Those counterclaims are DISMISSED.
Hudson Bay's motion to dismiss Mariano's market manipulation, fraudulent inducement and breach of the duty of good faith and fair dealing counterclaims is GRANTED. Those counterclaims are DISMISSED.
Further amendment to the dismissed counterclaims would be futile.
Hudson Bay's and CVII's motions to dismiss Defendants' breach of contract *121 counterclaims are DENIED.[23]
The Clerk of Court is directed to close the motions at ECF No. 147 (16-cv-2767) and ECF No. 79 (16-cv-2787).
SO ORDERED.

Hereinafter, record references related to the Hudson Bay action refers to Docket No.16-cv-2767, and record references related to the CVII action refers to Docket No. 16-cv-2787.

On January 30, 2018, Patriot National filed for relief under Chapter 11 of the U.S. Bankruptcy Code. (ECF Nos. 286, 164.) The automatic stay provision of 11 U.S.C. § 362 stays the "commencement or continuation" of "proceeding[s] against the debtor[.]" 11 U.S.C. § 362(a)(1). Patriot National argues that the stay applies to their counterclaims against the Funds, however, that is not the case. (ECF Nos. 290, 172.) "[T]he automatic stay provision of Section 362 by its terms only stays proceedings against the debtor, and does not address actions brought by the debtor which would inure to the benefit of the bankruptcy estate." Verragio, Ltd. v. AE Jewelers, Inc. , 2017 WL 1753478, at *2, 2017 U.S. Dist. LEXIS 68395, at *4-5 (S.D.N.Y. Apr. 27, 2017) (emphases added) (internal citation and quotation marks omitted); see Olick v. Parker & Parsley Petroleum Co., 145 F.3d 513, 516 (2d Cir. 1998). Therefore, the stay does not apply to a debtor's "third-party complaint, cross-claims," or as here, its "counterclaims." Vitranschart, Inc. v. Levy, No. 00-cv-3618 (SHS), 2000 WL 1239081, at *5 (SD.N.Y. Aug. 31, 2000).

The Funds urge this Court to reject Defendants' counterclaims on procedural grounds, including that Defendants are barred pursuant to the law of the case and for failure to seek leave to amend. Given the lengthy history of this litigation, this Court declines to make a procedural ruling, and instead looks to the merits of Defendants' counterclaims.

The "Transaction Documents" include the SPA, the REA, and the Non-Disclosure Agreement ("NDA"), further discussed below.

Hudson Bay submitted a second request on April 8, 2016.

Section 3(a)(xxxii) also allows the Funds to engage in "any transactions in or with respect to (including, without limitation, purchasing or selling, long and/or short) any securities of the Company" after public disclosure of the SPA. The section further provides that:
Buyers may engage in hedging and/or trading activities at various times during the period that the Securities are outstanding, including, without limitation, during the periods that the value and/or number of the Warrant Shares deliverable ... are being determined and such hedging and/or trading activities, if any, can reduce the value of the existing stockholders' equity interest in [Patriot National].... [Patriot National] acknowledges that such hedging and/or trading activities do not constitute a breach of this Agreement, the Warrants, or any other Transaction Document or any of the documents executed in connection herewith or therewith.

(Patriot's Hudson Bay Proposed Am. Countercls., ECF No. 162-01, at ¶ 11; Patriot's CVII Proposed Am. Countercls., ECF No. 93-1, at ¶ 9; Mariano's Hudson Bay Proposed Am. Countercls., ECF No. 164-06, at ¶ 12.)

(See Patriot's Hudson Bay Proposed Am. Countercls. ¶ 12; Patriot's CVII Proposed Am. Countercls. ¶ 10.)

(See Patriot's Hudson Bay Proposed Am. Countercls. ¶¶ 1, 83; Patriot's CVII Proposed Am. Countercls. ¶¶ 1, 81.)

(See Patriot's Hudson Bay Proposed Am. Countercls. ¶ 40; Patriot's CVII Proposed Am. Countercls. ¶ 37.)

(Patriot's Hudson Bay Proposed Am. Countercls. ¶ 83.)

(Id. ¶ 85.)

(Patriot's CVII Proposed Am. Countercls. ¶ 79.)

(Id. ¶ 81.)

Allowing Defendants' breach of contract counterclaims to move forward should not dramatically increase the cost of discovery and trial at this stage of the litigation given that the claims are exactly the same as the ones Defendants have lodged as general denials. As such, the parties should not need additional discovery.

(See, e.g. Mariano's Hudson Bay Proposed Am. Countercls. ¶ 114 ("Hudson Bay breached the duty of good faith and fair dealing implied in the" NDA, the SPA, and the REA "by surreptitiously borrowing millions of Patriot National Shares and thereafter shorting nearly 1.5 million shares to drive down the price of Patriot National shares").)

(Patriot's Hudson Bay Proposed Am. Countercls. ¶¶ 64-79; Patriot's CVII Proposed Am. Countercls. ¶¶ 59-74; Mariano's Hudson Bay Proposed Am. Countercls. ¶¶ 95-101.)

Here, Defendants allege that the Funds borrowed roughly 3.5 million shares of Patriot National stock and shorted less than 200,000 shares, a fraction of the shares borrowed.

(See Patriot's Hudson Bay Proposed Am. Countercls. ¶¶ 30, 37; Patriot's CVII Proposed Am. Countercls. ¶ 51; Mariano's Hudson Bay Proposed Am. Countercls. ¶ 52 (alleging "Hudson Bay alone represent 27% of the outstanding shares available for trading.").)

(See Patriot's Hudson Bay Proposed Am. Countercls. ¶¶ 25-26; Patriot's CVII Proposed Am. Countercls. ¶¶ 23-24; Mariano's Hudson Bay Proposed Am. Countercls. ¶¶ 40, 42.)

(See Patriot's Hudson Bay Proposed Am. Countercls. ¶¶ 46-47; Patriot's CVII Proposed Am. Countercls. ¶¶ 39-40; Mariano's Hudson Bay Proposed Am. Countercls. ¶¶ 65-67.)

Section 4(t) represents the only limitation the Transaction Documents placed on the Funds' ability to short Patriot stock following public disclosure. That Section prohibited the Funds from maintaining a "Net Short Position" during the Warrant pricing period-meaning that, during that period, the Funds could not hold a position whereby they have executed one or more sales of Patriot National stock short without having no "equivalent offsetting long position." (See Section 4(t).) Defendants do not allege that the Funds violated these terms.

Leave is granted for Defendants to file their proposed amended counterclaim asserting a breach of contract only.